

ORIGINAL
FILED

07 MAY -7 PM 2: 43

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

ANDREW L. PACKARD (Cal. Bar No. 168690)
MICHAEL P. LYNES (Cal. Bar No. 230462)
Law Offices of Andrew L. Packard
319 Pleasant Street
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (707) 763-9227
E-mail: andrew@packardlawoffices.com

MICHAEL R. LOZEAU (Cal. Bar No. 143892)
Law Office of Michael R. Lozeau
1516 Oak Street, Suite 216
Alameda, CA 94501
Tel: (510) 749-9102
Fax: (510) 749-9103
E-mail: mrlozeau@lozeaulaw.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

E-filing

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

CRB

CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE, a non-profit
corporation,

    Plaintiff,

    vs.

ALLIANCE RECYCLING, INC, a
corporation,

    Defendant.

Case No. C 07 2438

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF AND
CIVIL PENALTIES**

(Federal Water Pollution Control Act,
33 U.S.C. §§ 1251 to 1387)

CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA"), by and

through its counsel, hereby alleges:

## I.    JURISDICTION AND VENUE

1.    This is a civil suit brought under the citizen suit enforcement provisions of the

Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* (the "Clean Water Act" or

"the Act"). This Court has subject matter jurisdiction over the parties and the subject matter

of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF & CIVIL PENALTIES

1

U.S.C. § 1331 (an action arising under the laws of the United States).

2.      On or about February 2, 2007, Plaintiff provided notice of the Defendant's violations of the Act, and of its intention to file suit against the Defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the Regional Water Quality Control Board, Central Valley Region ("Regional Board"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).  A true and correct copy of CSPA's notice letter is attached as Exhibit A, and is incorporated by reference.

3.      More than sixty days have passed since notice was served on Defendant and the state and federal agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint.  This action is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.      Venue is proper in the Northern District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.  Pursuant to Local Rule 3-2(c), intradistrict venue is proper in Oakland, California because the sources of the violations are located within Alameda County, California.

II.    **INTRODUCTION**

5.      This complaint seeks relief for Defendant's discharges of polluted storm water from Defendant's metal recycling facility into the waters of the United States in violation of the Act and the State of California's General Permit for storm water discharges, State Water Resources Control Board ("State Board") Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ and Water Quality Order No. 97-03-DWQ, National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 (hereinafter "General Permit" or "Permit").  Defendant's violations of the filing, monitoring, reporting, discharge and management practice requirements, and other

1    procedural and substantive requirements of the General Permit and the Act are ongoing and

2    continuous.

3         6.    The failure on the part of persons and facilities such as Defendant and its

4    industrial facility to comply with the General Permit is recognized as a significant cause of

5    the continuing decline in water quality of the San Francisco Bay and other area receiving

6    waters.  The general consensus among regulatory agencies and water quality specialists is

7    that storm water pollution amounts to more than half the total pollution entering the aquatic

8    environment each year.  With every rainfall event, millions of gallons of polluted rainwater

9    originating from industrial facilities pour into the Bay and other waters in California.  In

10   most areas, storm water flows completely untreated through the storm drain system directly

11   to these waters of the United States.

12   **III.    PARTIES**

13        7.    Plaintiff CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

14   ("CSPA") is a non-profit public benefit corporation organized under the laws of the State of

15   California with offices in Woodland, California and Stockton, California.  CSPA has

16   approximately 3000 members who live and recreate in and around waters of the State of

17   California, including the San Francisco Bay.  CSPA is dedicated to the preservation,

18   protection, and defense of the environment, the wildlife and the natural resources of all

19   waters of California.  To further these goals, CSPA actively seeks federal and state agency

20   implementation of the Act and other laws and, where necessary, directly initiates

21   enforcement actions on behalf of itself and its members.

22        8.    Members of CSPA reside in and around the Bay and use and enjoy the Bay for

23   recreation and other activities.  Members of CSPA use and enjoy the waters into which

24   Defendant has caused, are causing, and will continue to cause, pollutants to be discharged.

25   Members of CSPA use those areas to fish, sail, boat, kayak, swim, birdwatch, view wildlife

26   and engage in scientific study including monitoring activities, among other activities.

27   Defendant's discharges of polluted storm water containing pollutants impair each of those

28   uses.  Thus, the interests of CSPA's members have been, are being, and will continue to be

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF & CIVIL PENALTIES
                                   3

adversely affected by Defendant's failure to comply with the Clean Water Act and the General Permit.  The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

9.      Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy or adequate remedy at law.

10.     Plaintiff is informed and believes, and thereupon alleges, that Alliance Recycling, Inc. is a corporation, organized under the laws of the State of California.

## IV.    STATUTORY BACKGROUND

11.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

12.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program.  33 U.S.C. § 1342(p).  States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342.

13.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

14.     The State Board elected to issue a statewide general permit for industrial discharges.  The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF & CIVIL PENALTIES

15.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.  33 U.S.C. §1311(a).

16.     The General Permit contains certain absolute prohibitions.  Discharge Prohibition A(1) of the General Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise regulated by an NPDES permit, to the waters of the United States.  Discharge Prohibition A(2) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the General Permit prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

17.     The General Permit requires dischargers to eliminate all non-storm water discharges to storm water conveyance systems other than those specifically set forth in Special Condition D(1)(a) of the General Permit and meeting each of the conditions set forth in Special Condition D(1)(b).

18.     In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent To Comply ("NOI").  The General Permit requires existing dischargers to have filed their NOIs before March 30, 1992.  Effluent Limitation B(3) of the Industrial Storm Water Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.

BAT and BCT include both nonstructural and structural measures. General Permit, Section A(8).

19. EPA has established the following benchmark values: aluminum – 0.750 mg/L; arsenic – 0.16854; cadmium – 0.159 mg/L; chemical oxygen demand – 120 mg/L; copper – 0.0636 mg/L; pH – 6.0-9.0;  iron – 1.0 mg/L; lead – 0.0816 mg/L; manganese – 1.0 mg/L; mercury – 0.0024 mg/L; nickel – 1.417 mg/L, total suspended solids – 100 mg/L; oil & grease – 15.0 mg/L; and zinc – 0.117 mg/L. The State Water Quality Control Board also recently proposed adding a benchmark level for specific conductance of 200 µmho/cm. The benchmark values are the pollutant concentrations that EPA has determined represent a level of concern. 65 Fed. Reg. 64766. The level of concern is a concentration at which a storm water discharge could potentially impair, or contribute to impairing, water quality or affect human health from ingestion of water or fish. *Id*. The benchmark values provide an appropriate level to determine whether a facility's storm water pollution prevention measures are successfully implemented. *Id*. at 64766-67.

20. Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). The SWPPP must comply with the BAT and BCT standards. The General Permit requires that an initial SWPPP have been developed and implemented before October 1, 1992. The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (Section A(2)). The SWPPP must also include BMPs that achieve BAT and BCT (Effluent Limitation B(3)). The SWPPP must include: a description of individuals and their responsibilities for developing and implementing the SWPPP (Section A(3)); a site map showing the facility boundaries, storm water drainage areas with flow pattern and nearby waterbodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of

industrial activity (Section A(4)); a list of significant materials handled and stored at the site (Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, and a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (Section A(6)). The SWPPP must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (Section A(7), (8)). The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (Section A(9),(10)).

21.    Receiving Water Limitation C(3) requires a discharger to prepare and submit a report to the Regional Board describing changes it will make to its current BMPs in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards. Once approved by the Regional Board, the additional BMPs must be incorporated into the Facility's SWPPP. The report must be submitted to the Regional Board no later than 60-days from the date the discharger first learns that its discharge is causing or contributing to an exceedance of an applicable water quality standard. Receiving Water Limitation C(4)(a). Section C(11)(d) of the Permit's Standard Provisions also requires dischargers to report any noncompliance. *See also* Provision E(6). Lastly, Section A(9) of the Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

22.    The General Permit requires dischargers commencing industrial activities before October 1, 1992 to develop and implement an adequate written Monitoring and Reporting Program no later than October 1, 1992. Existing facilities covered under the General Permit must implement all necessary revisions to their monitoring programs no later

than August 1, 1997.

23.    As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.  Dischargers must then conduct visual observations of these discharge locations for at least one storm per month during the wet season (October through May) and record their findings in their Annual Report.  Dischargers must also collect and analyze storm water samples from at least two storms per year.  Section B(5)(a) of the Industrial Storm Water Permit requires that dischargers "shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season.  All storm water discharge locations shall be sampled."  Section B(5)(c)(i) requires dischargers to sample and analyze during the wet season for basic parameters such as pH, total suspended solids ("TSS"), specific conductance, and total organic content ("TOC") or oil and grease, certain industry-specific parameters, and toxic chemicals and other pollutants likely to be in the storm water discharged from the facility.  Dischargers must also conduct dry season visual observations to identify sources of non-storm water pollution.  Dischargers electing to participate in a Group Monitoring Plan that has been approved by the State or Regional Board pursuant to Section B(15) of the General Permit are required to comply with all requirements of the Group Monitoring Plan.

24.    Section B(14) of the General Permit requires dischargers to submit an Annual Report by July 1 of each year to the executive officer of the relevant Regional Board.  The Annual Report must be signed and certified by an appropriate corporate officer.  Sections B(14), C(9), (10).  Section A(9)(d) of the Industrial Storm Water Permit requires the discharger to include in their annual report an evaluation of their storm water controls, and include a certification of compliance with the Industrial Storm Water Permit.  *See also* Sections C(9) and (10) and B(14).

25.    Section 505(a)(1) and Section 505(f) of the Act provide for citizen

1  enforcement actions against any "person," including individuals, corporations, or

2  partnerships, for violations of NPDES permit requirements and for unpermitted discharges of

3  pollutants.  33 U.S.C. §§1365(a)(1) and (f), § 1362(5).  An action for injunctive relief under

4  the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an

5  assessment of civil penalties of $27,500 per day (for violations from January 30, 1997 through

6  March 15, 2004, and $32,500 per day (for violations after March 15, 2004) pursuant to

7  Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d) and 1365 and 40 C.F.R. §§ 19.1 -

8  19.4.  Declaratory relief is authorized pursuant to 28 U.S.C. § 2201-02 (power to issue

9  declaratory relief in case of actual controversy and further necessary relief based on such a

10  declaration).

11       26.     The Regional Board has established water quality standards for the San

12  Francisco Bay in the Water Quality Control Plan for the San Francisco Bay Basin, generally

13  referred to as the Basin Plan.

14       27.     The Basin Plan includes a narrative toxicity standard which states that "[a]ll

15  waters shall be maintained free of toxic substances in concentrations that are lethal to or that

16  produce other detrimental responses in aquatic organisms."

17       28.     The Basin Plan provides that "[t]he pH shall not be depressed below 6.5 nor

18  raised above 8.5."

19       29.     The Basin Plan provides that "[w]aters shall not contain suspended material in

20  concentrations that cause nuisance or adversely affect beneficial uses" and that "[w]aters

21  shall not contain biostimulatory substances in concentrations that promote aquatic growths to

22  the extent that such growths cause nuisance or adversely affect beneficial uses."

23       30.     The Basin Plan establishes Marine Water Quality Objectives for the following

24  pollutants: zinc – 0.081 mg/l (4-day average), 0.090 mg/l (1-hour average); lead – of 0.0081

25  mg/L (4 day average), 0.21 mg/L (1hour average).

26       31.     EPA has established secondary Maximum Contaminant Levels as guidelines

27  for particular chemicals of concern.  These include:  aluminum of 0.05 - 0.2 mg/L; copper –

28  1.0 mg/L; and iron – 0.3 mg/L.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF & CIVIL PENALTIES

32.     EPA has established numeric water quality standards for priority toxic pollutants, including criteria intended to protect aquatic life.  These include (at a hardness of 100 mg/L):  copper – 0.009 mg/L; and zinc – 0.120 mg/L.  EPA has also established a numeric water quality criterion for aluminum of 0.087 mg/L.

## V.     STATEMENT OF FACTS

33.     Defendant operates a metal recycling facility located at 3426 Peralta Street, Oakland, California (the "Facility").  The Facility is classified under Standard Industrial Classification ("SIC") codes 5093 (Scrap & Waste Materials).  According to publicly available records, Defendant belatedly filed a notice of intent to comply with the terms of the Industrial Storm Water Permit on June 6, 1997, ten years after its operations were initiated and five years after being required to do so under federal law.

34.     The Facility collects and discharges storm water from its 8000 square foot industrial site to storm water drain system operated by the City of Oakland, which discharges into the San Francisco Bay.

35.      The main industrial activity at the Facility is the collection, sorting, storage and shipment of scrap metals and other recyclable materials.  Other activities include maintenance of the Facility and equipment, including washing of vehicles and machinery. Defendant operates the Facility on a continuous basis, 24 hours per day, seven days per week, 52 weeks per year.

36.     Based on its investigations, Plaintiff is informed and believes that the approximately 100% of the Facility consists of areas that are either paved or are covered by structures.

37.     The Facility includes at least three outfalls that have discharged and continue to discharge storm water from the Facility.

38.     Defendant is a member of the Metal Recyclers Monitoring Group ("MRMG"). Pursuant to Section B(15) of the General Permit, Defendant must "collect and analyze samples from at least two storm events in accordance with Section B.5. over the five-year period of this General Permit."

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF & CIVIL PENALTIES

39.    Defendant has taken samples of storm water discharges at the Facility for more than five years.  Since February 12, 2003, Defendant has taken samples of storm water discharges from the Facility and had them analyzed by a laboratory on at least two occasions.  The sample results were reported in the Facility's Annual Reports submitted to the Regional Board.

40.    Since at least February 12, 2003, Defendant has known that it discharges suspended solids in storm water discharged from the Facility.

41.    Since at least February 12, 2003, Defendant has known that it discharges oil and grease in storm water discharged from the Facility.

42.    Since at least February 12, 2003, Defendant has known that it discharges storm water containing COD at concentrations greater than 120 mg/L from the Facility.

43.    Since at least February 12, 2003, Defendant has known that it discharges storm water containing levels of specific conductivity greater than 200 μmho/cm from the Facility.

44.    Since at least February 12, 2003, Defendant has known that it discharges aluminum in storm water discharged from the Facility.

45.    Since at least February 12, 2003, Defendant has known that it discharges copper in storm water discharged from the Facility.

46.    Since at least February 12, 2003, Defendant has known that it discharges iron in storm water discharged from the Facility.

47.    Since at least February 12, 2003, Defendant has known that it discharges lead in storm water discharged from the Facility.

48.    Since at least February 12, 2003, Defendant has known that it discharges zinc in storm water discharged from the Facility.

49.    Since at least February 12, 2003, Defendant has known that it discharges storm water with a pH of less than 6.5 pH units from the Facility.

50.    The levels of total suspended solids detected by Defendant in the storm water discharged from its Facility have consistently been at or exceeded the benchmark value for total suspended solids established by the EPA.  This has occurred on at least two occasions

since February 12, 2003. The levels of total suspended solids detected by the Defendant in storm water discharged from the Facility exceed the narrative limits that EPA or the Boards have established as narrative water quality standards applicable to total suspended solids in California. This has occurred on at least two occasions since February 12, 2003. For example, on February 12, 2003, Defendant analyzed storm water discharged from the Facility and found the level of total suspended solids was 1400 mg/L. That level is 1400 percent of the EPA benchmark value for total suspended solids. More recently, on January 25, 2005, Defendant analyzed storm water discharged from the Facility and again found the level of total suspended solids was 480 mg/L. That level is 480 percent of the EPA benchmark value for total suspended solids.

51.    The levels of oil and grease detected by Defendant in the storm water discharged from its Facility have consistently been at or exceeded the benchmark value for oil and grease established by the EPA. This has occurred on at least two occasions since February 12, 2003. For example, on February 12, 2003, Defendant analyzed storm water discharged from the Facility and found the level of oil and grease was 220 mg/L. That level is more than 1466 percent of the EPA benchmark value for oil and grease. More recently, on January 25, 2005, Defendant analyzed storm water discharged from the Facility and again found the level of oil and grease was 110 mg/L mg/L. That level is more than 733 percent of the EPA benchmark value for total suspended solids.

52.    The levels of aluminum detected by Defendant in the storm water discharged from its Facility have consistently been at or exceeded the benchmark value for aluminum established by the EPA. This has occurred on at least two occasions since February 12, 2003. For example, on February 12, 2003, Defendant analyzed storm water discharged from the Facility and found the level of aluminum was 18.6 mg/L. That level is 2480 percent of the EPA benchmark value for aluminum. More recently, on January 25, 2005, Defendant analyzed storm water discharged from the Facility and again found the level of aluminum was 18.4 mg/L. That level is more than 2453 percent of the EPA benchmark value for aluminum.

53.    The levels of copper detected by Defendant in the storm water discharged from its Facility have consistently been at or exceeded the benchmark value for copper established by the EPA. This has occurred on at least two occasions since February 12, 2003. For example, on February 12, 2003, Defendant analyzed storm water discharged from the Facility and found the level of copper was 0.816 mg/L. That level is more than 1283 percent of the EPA benchmark value for copper. More recently, on January 25, 2005, Defendant analyzed storm water discharged from the Facility and again found the level of copper was 1.16 mg/L. That level is more than 1823 percent of the EPA benchmark value for copper.

54.    The levels of iron detected by Defendant in the storm water discharged from its Facility have consistently been at or exceeded the benchmark value for iron established by the EPA. This has occurred on at least two occasions since February 12, 2003. For example, on February 12, 2003, Defendant analyzed storm water discharged from the Facility and found the level of iron was 63.8 mg/L. That level is 6830 percent of the EPA benchmark value for iron. More recently, on January 25, 2005, Defendant analyzed storm water discharged from the Facility and again found the level of iron was 76.2 mg/L. That level is 7620 percent of the EPA benchmark value for iron.

55.    The levels of lead detected by Defendant in the storm water discharged from its Facility have consistently been at or exceeded the benchmark value for lead established by the EPA. This has occurred on at least two occasions since February 12, 2003. For example, on February 12, 2003, Defendant analyzed storm water discharged from the Facility and found the level of lead was 0.466 mg/L. That level is approximately 571 percent of the EPA benchmark value for lead. More recently, on January 25, 2005, Defendant analyzed storm water discharged from the Facility and again found the level of lead was 1.57 mg/L. That level is more than 1924 percent of the EPA benchmark value for lead.

56.    The levels of zinc detected by Defendant in the storm water discharged from its Facility have consistently been at or exceeded the benchmark value for zinc established by the EPA. This has occurred on at least two occasions since February 12, 2003. For

example, on February 12, 2003, Defendant analyzed storm water discharged from the Facility and found the level of zinc was 5.13 mg/L. That level is more than 4384 percent of the EPA benchmark value for zinc. More recently, on January 25, 2005, Defendant analyzed storm water discharged from the Facility and again found the level of lead was 5.12 mg/L. That level is more than 4376 percent of the EPA benchmark value for zinc.

57.    The levels of COD detected by Defendant in the storm water discharged from its Facility have consistently been at or exceeded the benchmark value for COD established by the EPA. This has occurred on at least two occasions since February 12, 2003. For example, on February 12, 2003, Defendant analyzed storm water discharged from the Facility and found the level of COD was 9100 mg/L. That is more than 7583 percent of the EPA benchmark value for COD. More recently, on January 25, 2005, Defendant analyzed storm water discharged from the Facility and again found the level of COD was 3200 mg/L. That is more than 2666 percent of the EPA benchmark value for COD.

58.    The levels of specific conductivity detected by Defendant in the storm water discharged from the Facility have exceeded the benchmark value for specific conductivity proposed by the State Water Board. This has occurred on at least two occasions since February 12, 2003. For example, on February 12, 2003, Defendant analyzed storm water discharged from the Facility and found the level of specific conductivity was 1400 µmho/cm. That level is 700 percent of the proposed benchmark value. More recently, on January 25, 2005, Defendant analyzed storm water discharged from the Facility and found the level of specific conductivity was 2480 µmho/cm. That level is 1240 percent of the proposed benchmark value.

59.    The levels of pH detected by Defendant in the storm water discharged from the Facility have exceeded the allowable limits established in the Basin Plan. This has occurred on at least two occasions since February 12, 2003.

60.    The monitoring results described above were reported in Defendant's Annual Reports submitted to the Regional Board. Form 5 of those Annual Reports is supposed to include Defendant's evaluation of the adequacy of best management practices at the Facility.

Defendant has failed to include any discussion of any of its exceedances of the EPA's benchmark values or other applicable water quality criteria in any of its Annual Reports submitted in the past five years.

61.    On information and belief, Plaintiff alleges that since at least October 27, 2001, Defendant has consistently failed to implement its monitoring plan.

62.    On information and belief, Plaintiff alleges that since at least October 27, 2001, Defendant and has not monitored storm water discharged from all of the Facility's discharge points for levels of nickel.

63.    Defendant has failed to comply with Section B(5)(a) of the General Industrial Storm Water Permit by failing to collect storm water samples during the first hour of discharge from the first storm event of the wet season and from at least one other storm event per year during the wet seasons of 2001-2002, 2002-2003, 2003-2004, 2004-2005, and 2005-2006.

64.    On information and belief, Plaintiff alleges that Defendant has failed to prepare and regularly update its SWPPP to set forth site-specific best management practices for the Facility that are adequate to achieve BAT or BCT at the Facility.

65.    Information available to Plaintiff indicates that as a result of Defendant's failure to evaluate the effectiveness of its existing BMPs, its failure to implement BAT and BCT at the Facility, its failure to fully monitor the quality of storm water discharges from the Facility and its failure to maintain an adequate SWPPP and monitoring program for the Facility, storm water containing pollutants harmful to fish, plant and bird life, and human health is being discharged during every rain event from the Facility directly to storm channels or drains that flow to the San Francisco Bay.

66.    The storm drains and channels operated by the City of Oakland are tributary to the San Francisco Bay.  The San Francisco Bay is a water of the United States.

67.    Plaintiff is informed and believes, and thereupon alleges, that Defendant's discharges of storm water polluted by impermissible levels of pH, total suspended solids, specific conductivity, COD, oil and grease, aluminum, copper, iron, lead, zinc and other

pollutants cause or contribute to violations of water quality standards in the San Francisco Bay.

68.     Plaintiff is informed and believes, and thereupon alleges, that Defendant's failure to monitor storm water discharged from all of the Facility's discharges points for all pollutants likely to be discharged in storm water from Defendant's facility, including but not limited to nickel, results in Defendant's failure to control the these pollutant discharges and therefore causes or contribute to violations of water quality standards for these pollutants in the San Francisco Bay.

69.     Information available to Plaintiff indicates that Defendant has not submitted any reports pursuant to Receiving Water Limitation C(4)(a) within 60-days of becoming aware of levels in its storm water exceeding the EPA benchmark values or applicable water quality standards.  Based on Plaintiff's review of available documents, Defendant was aware of high levels of many of these pollutants, particularly total suspended solids, prior to October 27, 2001.  Information available to Plaintiff indicates that Defendant has not filed any reports describing the Facility's noncompliance with the General Permit pursuant to Section C(11)(d) of the General Permit.

70.     Defendant has violated Sections A(9)(d), B(14) and C(9) & (10) of the General Industrial Storm Water Permit in each of the past five years, each time Defendant submitted an incomplete or incorrect Annual Report that falsely certified that Defendant and its Facility were in compliance with the Act.

71.     Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to its continued discharge of contaminated storm water without the control technology required by federal law.

72.     Information available to Plaintiff indicates the continued existence of unlawful storm water and non-storm water discharges at the Facility.

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Discharges of Contaminated Storm Water
in Violation of Permit Conditions and the Act
(Violations of 33 U.S.C. §§ 1311(a), 1342)**

73.    Plaintiff realleges and incorporates Paragraphs 1-72, inclusive, as if fully set forth herein.

74.    Discharge Prohibition A(2) of the General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitations C(1) and C(2) of the General Permit require that storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.  Discharge Prohibition A(1) of the General Permit prohibits the direct or indirect discharge of materials other than storm water, which are not otherwise regulated by an NPDES permit, to waters of the United States.

75.    Plaintiff is informed and believes, and thereupon alleges, that since at least June 6, 1997, Defendant has been discharging polluted storm water from the Facility to the storm water system operated by the City of Oakland and the San Francisco Bay in violation of the General Permit.

76.    During every rain event, rainwater flowing over exposed materials and accumulated pollutants at the Facility becomes contaminated with pollutants and flows untreated from the Facility to the storm water system operated by the City of Oakland and the San Francisco Bay.

77.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing pollution and contamination of the waters of the United States in violation of Discharge Prohibition A(2) of the General Permit.

78.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF & CIVIL PENALTIES

17

1  violation of Receiving Water Limitation C(1) of the General Permit.

2      79.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of

3  contaminated storm water are contributing to the violation of the applicable water quality

4  standards in the Statewide Water Quality Control Plan and/or the applicable Regional Board's

5  Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

6      80.    Every day since June 6, 1997 that Defendant has discharged and continues to

7  discharge polluted storm water and non-storm water from the Facility in violation of the

8  General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. §

9  1311(a).  These violations are ongoing and continuous.

10      WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

11  ## SECOND CAUSE OF ACTION
**Failure to Develop and Implement an Adequate Storm Water Pollution Prevention Plan**

12  **(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

13      81.    Plaintiff realleges and incorporates Paragraphs 1-80, as if fully set forth herein.

14      82.    Section A and Provision E of the General Permit requires dischargers of storm

15  water associated with industrial activity to develop and implement an adequate Storm Water

16  Pollution Prevention Plan ("SWPPP") no later than October 1, 1992.

17      83.    Defendant has failed to develop and implement an adequate SWPPP for the

18  Facility.  Defendant's ongoing failure to develop and implement an adequate SWPPP for the

19  Facility is evidenced by, *inter alia*, Defendant's over-reliance on inadequate housekeeping

20  measures rather than BAT or BCT for the Facility; the continued exposure of significant

21  quantities of industrial material to storm water flows; the failure to either treat storm water

22  prior to discharge or to implement effective containment practices; and the continued

23  discharge of storm water pollutants from the Facility at levels in excess of EPA benchmark

24  values and other applicable water quality criteria.

25      84.    The General Permit's SWPPP requirements and Effluent Limitation B(3)

26  require dischargers to reduce or prevent pollutants in their storm water discharges through

27  implementation of BAT for toxic and nonconventional pollutants and BCT for conventional

28  pollutants.  Defendant has failed to implement BAT and BCT at the Facility for its

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF & CIVIL PENALTIES
18

discharges of impermissible levels of pH, total suspended solids, specific conductivity, and total organic carbon in violation of Effluent Limitation B(3) of the General Permit.

85.    Defendant has failed to update the Facility's SWPPP and BMPs in response to the analytical results of the Facility's storm water monitoring.  Defendant has failed to submit reports pursuant to Receiving Water Limitation C(4)(a) within 60-days of becoming aware of levels in the Facility's storm water exceeding the EPA benchmark values and applicable water quality standards.  Defendant has not filed any reports describing its noncompliance with the General Permit in violation of Section C(11)(d).

86.    Each day since October 1, 1992 that Defendant has failed to develop, implement and update an adequate SWPPP for the Facility and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

87.    Defendant has been in violation of the SWPPP and BAT/BCT requirements every day since October 1, 1992.  Defendant continues to be in violation of the SWPPP requirement each day that they fail to develop and fully implement an adequate SWPPP for the Facility.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## THIRD CAUSE OF ACTION
**Failure to Develop and Implement an Adequate Monitoring and Reporting Program**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

88.    Plaintiff realleges and incorporates Paragraphs 1-87, as if fully set forth herein.

89.    Section B of the General Permit requires dischargers of storm water associated with industrial activity to develop and implement a monitoring and reporting program (including, among other things, sampling and analysis of discharges) no later than October 1, 1992.

90.    Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility.  Defendant's ongoing failures to develop and implement adequate monitoring and reporting programs are evidenced by, *inter alia*, its failure to monitor

1    for requisite pollution parameters and their failure to monitor all of its storm water discharge

2    points.

3        91.    Each day since October 1, 1992 that Defendant has failed to develop and

4    implement an adequate monitoring and reporting program for the Facility in violation of the

5    General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. §

6    1311(a).  This failure to develop and implement an adequate monitoring and reporting

7    program for the Facility constitutes an ongoing and continuous violation of the Act.

8        WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

9    **VII.    RELIEF REQUESTED**

10       Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

11           a.   Declare Defendant to have violated and to be in violation of the Act as

12   alleged herein;

13           b.   Enjoin Defendant from discharging pollutants from the Facility to waters of

14   the United States;

15           c.   Enjoin Defendant from further violating the substantive and procedural

16   requirements of the General Permit;

17           d.   Order Defendant to pay civil penalties of $27,500 per day per violation for

18   all violations occurring before March 15, 2004, and $32,500 per day per violation for all

19   violations occurring after March 15, 2004, for each violation of the Act pursuant to Sections

20   309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d) and 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

21           e.   Order Defendant to take appropriate actions to restore the quality of

22   navigable waters impaired by their activities;

23           f.   Award Plaintiff costs (including reasonable investigative, attorney, consultant

24   and expert fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

25           g.   Award any such other and further relief as this Court may deem appropriate.

26

27

28

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF & CIVIL PENALTIES

1

2

3    Dated: May 7, 2007                    Respectfully Submitted,

4                                          LAW OFFICES OF ANDREW L. PACKARD
                                           LAW OFFICE OF MICHAEL R. LOZEAU
5

6                                          By: _____
                                               Michael P. Lynes
7                                              Attorneys for Plaintiff
                                               CALIFORNIA SPORTFISHING
8                                              PROTECTION ALLIANCE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF & CIVIL PENALTIES

**EXHIBIT A**

# California Sportfishing Protection Alliance
## *"An Advocate for Fisheries, Habitat and Water Quality"*

February 2, 2007

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
Jerome Anast
Alliance Recycling, Inc.
3426 Peralta Street
Oakland, CA 94608

Rena Ricles
Agent of Service of Process, Alliance Recyclers, Inc.
1970 Broadway Street, Suite 1200
Oakland, CA 94612

Re:    **Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act**

Dear Sir:

I am writing on behalf of the California Sportfishing Protection Alliance ("CSPA") in regard to violations of the Clean Water Act ("the Act") occurring at Alliance Recycling, Inc's facility located at 3426 Peralta Street, Oakland, California ("the Facility") and operating  under the name "Alliance Recycling."  The WDID identification number for the Facility is 201S012241.  CSPA is a non-profit public benefit corporation dedicated to the preservation, protection, and defense of the environment, wildlife and natural resources of the San Francisco Bay and other California waters.  This letter is being sent to you as the responsible owners, officers, or operators of Alliance Recycling, Inc. (hereafter "Alliance Recycling" or "you").

This letter addresses Alliance Recycling's unlawful discharges of pollutants from the Facility to the City of Oakland's storm drain system, which discharges into the San Francisco Bay.  This letter addresses ongoing violations of the substantive and procedural requirements of the Clean Water Act and National Pollutant Discharge Elimination System ("NPDES") General Industrial Storm Water Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ ("General Industrial Storm Water Permit").

Section 505(b) of the Clean Water Act provides that sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen must give notice of intent to file suit.  Notice must be given to the alleged violator, the

CSPA Notice of Violation and Intent To File Suit
February 2, 2007
Page 2 of 11

U.S. Environmental Protection Agency ("the EPA"), and the State in which the violations occur.

As required by the Clean Water Act, this Notice of Violation and Intent to File Suit provides notice of the violations that have occurred, and continue to occur, at the Facility. Consequently, Alliance Recycling is hereby placed on formal notice by CSPA that, after the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, CSPA intends to file suit in federal court against Alliance Recycling Industries, Inc. under Section 505(a) of the Clean Water Act (33 U.S.C. § 1365(a)), for violations of the Clean Water Act and the General Industrial Storm Water Permit. These violations are described more fully below.

## I. Background.

On June 6, 1997, Alliance Recycling submitted its notice of intent to comply with the terms of the General Industrial Storm Water Permit. Based on CSPA's review of available documents, the Facility is classified under Standard Industrial Classification Code 5093 ("Scrap & Waste Materials. The Facility collects and discharges storm water from its 8,000 square-foot industrial site to the City of Oakland's storm drain system, which discharges into the San Francisco Bay.

The San Francisco Regional Water Quality Control Board (the "Regional Board" or "Board") has established water quality standards for the San Francisco Bay, including the Oakland Estuary and the San Leandro Bay, in the "Water Quality Control Plan for the San Francisco Bay Basin," generally referred to as the Basin Plan. *See* http://www.swrcb.ca.gov/rwqcb2/basinplan.htm. The Basin Plan includes a narrative toxicity standard stating that "[a]ll waters shall be maintained free of toxic substances in concentrations that are lethal to or that produce other detrimental responses in aquatic organisms." *See* http://www.swrcb.ca.gov/rwqcb2/basinplan/web/BP_CH3.html. The Basin Plan provides that "[t]he pH shall not be depressed below 6.5 nor raised above 8.5." *See id.* The Basin Plan provides that "[w]aters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses." *See id.* The Basin Plan provides that "[w]aters shall not contain biostimulatory substances in concentrations that promote aquatic growths to the extent that such growths cause nuisance or adversely affect beneficial uses." *See id.*

The Basin Plan establishes Marine Water Quality Objectives for the following pollutants: zinc – 0.081 mg/l (4-day average), 0.090 mg/l (1-hour average); cadmium – of 0.0093 mg/L (4-day average), 0.042 mg/L (1-hour average); lead – of 0.0081 mg/L (4 day average), 0.21 mg/L (1hour average). *See* http://www.swrcb.ca.gov/rwqcb2/basinplan/web/tab_3-3.html.

EPA has established secondary MCL, consumer acceptance limits of 0.02 mg/L for aluminum and 1.0 mg/L for iron. *See* http://www.epa.gov/safewater/mcl.html#mcls. The California Department of Health Services has also established MCLs of 0.2-1.0 mg/L

for aluminum and.0.3 mg/L for iron. *See* California Code of Regulations, title 22, §§ 64431, 64449. EPA has also established numeric water quality standards for priority toxic pollutants (at a hardness of 100 mg/l), including: 0.009 mg/L for copper, 1.0 mg/L for iron, and 0.1 mg/L for zinc. *See* http://www.epa.gov/waterscience/criteria/wqcriteria. htm.

The General Industrial Storm Water Permit incorporates benchmark levels established by EPA as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT"). The following benchmarks have been established for pollutants discharged by Alliance Recycling: aluminum – 0.750 mg/L; arsenic – 0.16854; cadmium – 0.159 mg/L; chemical oxygen demand – 120 mg/L; copper – 0.0636 mg/L; pH – 6.0-9.0; iron – 1.0 mg/L; lead – 0.0816 mg/L; manganese – 1.0 mg/L; mercury – 0.0024 mg/L; nickel – 1.417 mg/L, total suspended solids – 100 mg/L; oil & grease – 15.0 mg/L; and zinc – 0.117 mg/L. The State Water Quality Control Board also recently proposed adding a benchmark level for specific conductance of 200 μmho/cm.

## II.    Pollutant Discharges in Violation of the NPDES Permit.

Alliance Recycling has violated and continues to violate the terms and conditions of the General Industrial Storm Water Permit. Section 402(p) of the Act prohibits the discharge of storm water associated with industrial activities, except as permitted under an NPDES permit (33 U.S.C. § 1342) such as the General Industrial Storm Water Permit. Discharge Prohibition A(1) of the General Industrial Storm Water Permit prohibits the discharge of materials other than storm water (defined as non-storm water discharges) that discharge either directly or indirectly to waters of the United States. Discharge Prohibition A(2) of the General Industrial Storm Water Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

Receiving Water Limitation C(1) of the General Industrial Storm Water Permit prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impact human health or the environment. Receiving Water Limitation C(2) of the General Industrial Storm Water Permit also prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

### A.    *Discharges in Violation of the Permit.*

Alliance Recycling has discharged and continues to discharge stormwater with levels of total suspended solids ("TSS"), pH, specific conductivity, oil and grease, chemical oxygen demand ("COD"), aluminum, copper, iron, lead, and zinc in violation of the General Industrial Storm Water Permit. These high pollutant levels have been

CSPA Notice of Violation and Intent To File Suit
February 2, 2007
Page 4 of 11

documented during significant rain events, including rain events indicated in the table of rain data attached hereto as Exhibit A. Alliance Recycling's Annual Reports and Sampling and Analysis Results confirm discharges of specific pollutants and materials other than stormwater in violation of the Permit provisions listed above. Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

Alliance Recycling has violated Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Industrial Storm Water Permit by discharging storm water with unacceptable levels of TSS, pH, specific conductivity, oil and grease, COD, aluminum, copper, iron, lead, and zinc on at least the following occasions:

| Date | Parameter | Concentration | Water Quality Objective |
|------|-----------|---------------|-------------------------|
| 12/25/2005 (# 1) | TSS | 633 mg/L | 100 mg/L |
| 12/25/2005 (# 1) | pH | 4.27 | 6.0 – 9.0; 6.5 – 8.5 |
| 12/25/2005 (# 1) | Specific Conductivity | 1400 µmho/cm | 200 µmho/cm |
| 12/25/2005 (# 1) | Oil & Grease | 110 mg/L | 15.0 mg/L |
| 12/25/2005 (# 1) | COD | 3000 mg/L | 110 mg/L |
| 12/25/2005 (# 1) | Aluminum | 8.02 mg/L | 0.75 mg/L |
| 12/25/2005 (# 1) | Copper | 1.16 mg/L | 0.0636 mg/L |
| 12/25/2005 (# 1) | Iron | 27.1 mg/L | 1.0 mg/L |
| 12/25/2005 (# 1) | Lead | 0.352 mg/L | 0.016 mg/L |
| 12/25/2005 (# 1) | Zinc | 2.97 mg/L | 0.117 mg/L |
| 12/25/2005 (# 2) | TSS | 350 mg/L | 100 mg/L |
| 12/25/2005 (# 2) | pH | 4.74 | 6.0 – 9.0; 6.5 – 8.5 |
| 12/25/2005 (# 2) | Specific Conductivity | 1570 µmho/cm | 200 µmho/cm |
| 12/25/2005 (# 2) | Oil & Grease | 60 | 15.0 mg/L |
| 12/25/2005 (# 2) | COD | 3200 | 110 mg/L |
| 12/25/2005 (# 2) | Aluminum | 6.25 mg/L | 0.75 mg/L |
| 12/25/2005 (# 2) | Copper | 0.325 mg/L | 0.0636 mg/L |
| 12/25/2005 (# 2) | Iron | 32.2 mg/L | 1.0 mg/L |
| 12/25/2005 (# 2) | Lead | 1.57 mg/L | 0.016 mg/L |
| 12/25/2005 (# 2) | Zinc | 3.42 | 0.117 mg/L |
| 12/25/2005 (# 3) | TSS | 480 mg/L | 100 mg/L |
| 12/25/2005 (# 3) | pH | 4.89 | 6.0 – 9.0; 6.5 – 8.5 |
| 12/25/2005 (# 3) | Specific Conductivity | 2480 µmho/cm | 200 µmho/cm |
| 12/25/2005 (# 3) | Oil & Grease | 75 mg/L | 15.0 mg/L |
| 12/25/2005 (# 3) | COD | 5000 mg/L | 110 mg/L |
| 12/25/2005 (# 3) | Aluminum | 18.4 mg/L | 0.75 mg/L |

CSPA Notice of Violation and Intent To File Suit
February 2, 2007
Page 5 of 11

| 12/25/2005 (# 3) | Copper | 0.462 mg/L | 0.0636 mg/L |
|---|---|---|---|
| 12/25/2005 (# 3) | Iron | 76.2 mg/L | 1.0 mg/L |
| 12/25/2005 (# 3) | Lead | 0.202 mg/L | 0.016 mg/L |
| 12/25/2005 (# 3) | Zinc | 5.12 mg/L | 0.117 mg/L |
| 2/12/2003 (# 1) | TSS | 1110 mg/L | 100 mg/L |
| 2/12/2003 (# 1) | Specific Conductivity | 1259 µmho/cm | 200 µmho/cm |
| 2/12/2003 (# 1) | Oil & Grease | 180 mg/L | 15 mg/L |
| 2/12/2003 (# 1) | COD | 9100 mg/L | |
| 2/12/2003 (# 1) | Aluminum | 13.8 mg/L | 0.75 mg/L |
| 2/12/2003 (# 1) | Copper | 0.675 mg/L | 0.0636 mg/L |
| 2/12/2003 (# 1) | Iron | 58.5 mg/L | 1.0 mg/L |
| 2/12/2003 (# 1) | Lead | 0.259 mg/L | 0.0816 mg/L |
| 2/12/2003 (# 1) | Zinc | 3.06 mg/L | 0.117 mg/L |
| 2/12/2003 (# 2) | TSS | 1380 mg/L | 100 mg/L |
| 2/12/2003 (# 2) | pH | 6.15 | 6.0 – 9.0; 6.5 – 8.5 |
| 2/12/2003 (# 2) | Specific Conductivity | 1400 µmho/cm | 200 µmho/cm |
| 2/12/2003 (# 2) | Oil & Grease | 220 mg/L | 15 mg/L |
| 2/12/2003 (# 2) | COD | 11,000 mg/L | |
| 2/12/2003 (# 2) | Aluminum | 13.9 mg/L | 0.75 mg/L |
| 2/12/2003 (# 2) | Copper | 0.816 mg/L | |
| 2/12/2003 (# 2) | Iron | 56.8 mg/L | 1.0 mg/L |
| 2/12/2003 (# 2) | Lead | 0.466 mg/L | |
| 2/12/2003 (# 2) | Zinc | 5.04 mg/L | 0.117 mg/L |
| 2/12/2003 (# 3) | TSS | 1400 | 100 mg/L |
| 2/12/2003 (# 3) | pH | 6.41 | 6.0 – 9.0; 6.5 – 8.5 |
| 2/12/2003 (# 3) | Specific Conductivity | 920 µmho/cm | 200 µmho/cm |
| 2/12/2003 (# 3) | Oil & Grease | 190 mg/L | 15 mg/L |
| 2/12/2003 (# 3) | COD | 6700 mg/L | |
| 2/12/2003 (# 3) | Aluminum | 18.6 mg/L | 0.75 mg/L |
| 2/12/2003 (# 3) | Copper | 0.492 mg/L | |
| 2/12/2003 (# 3) | Iron | 63.8 mg/L | 1.0 mg/L |
| 2/12/2003 (# 3) | Lead | 0.356 mg/L | |
| 2/12/2003 (# 3) | Zinc | 5.13 mg/L | 0.117 mg/L |

Alliance Recycling's Annual Reports confirm that Alliance Recycling has known that its stormwater contains the above-listed pollutants at levels exceeding EPA Benchmarks and other water quality criteria since prior to February 2, 2002. CSPA alleges that such violations also have occurred and will occur on other rain dates, including during every significant rain event that has occurred since at least February 2, 2002, and that will occur at the Facility subsequent to the date of this Notice of Violation and Intent to File Suit. Attachment A, attached hereto, sets forth specific rain dates on

which CSPA alleges that Alliance Recycling has discharged storm water containing impermissible levels of TSS, pH, specific conductivity, oil and grease, COD, aluminum, arsenic, cadmium, chromium, copper, iron, lead, manganese, mercury, nickel, zinc and other pollutants in violation of Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Industrial Storm Water Permit.

These unlawful discharges from the Facility are ongoing. Each discharge of stormwater containing pollutants at unacceptable levels from the Facility constitutes a separate violation of the General Industrial Storm Water Permit and the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Alliance Recycling is subject to penalties for violations of the General Industrial Storm Water Permit and the Act since February 2, 2002.

**B.    *Failure to Develop and Implement an Adequate Storm Water Monitoring Plan***

Section B(5)(a) of the General Industrial Storm Water Permit requires that dischargers "shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season. <u>All</u> storm water discharge locations shall be sampled." (emphasis added) Section B(5)(c)(i) further requires that the samples shall be analyzed for total suspended solids, pH, specific conductance, and total organic carbon. Oil and grease may be substituted for total organic carbon. Section B(5)(c)(ii) requires that "samples shall be analyzed for . . . [t]oxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities."

Alliance Recycling is a member of the Metal Recyclers Monitoring Group ("MRMG"). Pursuant to Section B(15) of the of the General Permit, Alliance Recycling must "collect and analyze samples from at least two storm events in accordance with Section B.5. over the five-year period of this General Permit." According to documents filed with the Regional Board and the MRMG, Alliance Recycling has failed to comply with Section B(5)(a) of the General Industrial Storm Water Permit by failing to collect storm water samples during the first hour of discharge from the first storm event of the wet season and from at least one other storm event per year during each of the wet seasons since the 2000-2001 wet season. Alliance Recycling also violated Section B(5) by failing to collect storm water samples from all storm water discharge locations at the Facility in each of the years it was required to sample. Alliance Recycling failed to collect and analyze samples from at least two storm events during a given wet season during the past five years. Alliance Recycling also failed to conduct visual observations of every discharge point at the Facility at least once per month during each wet season since the 2000-2001 wet season, as required by the General Permit.

Alliance Recycling has also failed to analyze its storm water samples for all chemicals and pollutants that are "likely to be present in storm water discharges in

CSPA Notice of Violation and Intent To File Suit
February 2, 2007
Page 7 of 11

significant quantities." See Section B(5)(c)(ii). CSPA is informed and believes that at least the following pollutants are "likely" to be present in Alliance Recycling's storm water discharges in significant quantities: arsenic, cadmium, chromium, manganese, mercury and nickel. Alliance Recycling's ongoing failure to analyze its storm water samples for these and other pollutants likely to be present in its storm water discharges constitutes ongoing violations of the Act.

Each of Alliance Recycling's failures to comply with these mandatory monitoring requirements constitutes an ongoing violation of the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Alliance Recycling is subject to penalties for these violations of the General Industrial Storm Water Permit and the Act since February 2, 2002.

**C.    *Failure to Implement BAT and BCT*.**

Effluent Limitation B(3) of the General Industrial Storm Water Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants. BAT and BCT include both nonstructural and structural measures. General Industrial Storm Water Permit, Section A(8). CSPA's investigation indicates that Alliance Recycling has not implemented BAT and BCT at the Facility for its discharges of TSS, pH, specific conductivity, oil and grease, COD, aluminum, iron, lead, and zinc, and other pollutants in violation of Effluent Limitation B(3) of the General Industrial Storm Water Permit.

Alliance Recycling was required to have implemented BAT and BCT by no later than October 1, 1992. Alliance Recycling has been in continuous violation of the BAT and BCT requirements every day since October 1, 1992, and will continue to be in violation every day that Alliance Recycling fails to implement BAT and BCT. Alliance Recycling is subject to penalties for violations of the Order and the Act occurring since February 2, 2002.

**D.    *Failure to Develop and Implement an Adequate Storm Water Pollution Prevention Plan***

Section A(1) and Provision E(2) of the General Industrial Storm Water Permit require dischargers of storm water associated with industrial activity to develop, implement an adequate SWPPP no later than October 1, 1992 and to continuously update the SWPPP and its implementation to reflect BAT and BCT storm water controls. Section A(1) and Provision E(2) requires dischargers who submitted an NOI pursuant to the Order to continue following their existing SWPPP and implement any necessary revisions to their SWPPP in a timely manner, but in any case, no later than August 1, 1997.

CSPA Notice of Violation and Intent To File Suit
February 2, 2007
Page 8 of 11

The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (General Industrial Storm Water Permit, Section A(2)). The SWPPP must also include BMPs that achieve BAT and BCT (Effluent Limitation B(3)). The SWPPP must include: a description of individuals and their responsibilities for developing and implementing the SWPPP (General Industrial Storm Water Permit, Section A(3)); a site map showing the facility boundaries, storm water drainage areas with flow pattern and nearby waterbodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity (General Industrial Storm Water Permit, Section A(4)); a list of significant materials handled and stored at the site (General Industrial Storm Water Permit, Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (General Industrial Storm Water Permit, Section A(6)).

The SWPPP also must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (General Industrial Storm Water Permit, Section A(7), (8)). The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (General Industrial Storm Water Permit, Section A(9),(10)). Receiving Water Limitation C(3) of the Order requires that dischargers submit a report to the appropriate Regional Water Board that describes the BMPs that are currently being implemented and additional BMPs that will be implemented to prevent or reduce the discharge of any pollutants causing or contributing to the exceedence of water quality standards.

CSPA's investigation of the conditions at the Facility demonstrates that Alliance Recycling has been operating with an inadequately developed or implemented SWPPP in violation of the requirements set forth above. Alliance Recycling's own Annual Reports and sampling and analysis demonstrate the inadequacy of Alliance Metal's SWPPP. Despite having years of data that indicate that Alliance Metal's storm water discharges contain pollutants in excess of EPA Benchmarks and other water quality standards, Alliance Recycling has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary. Alliance Recycling has been in continuous violation of Section A(1) and Provision E(2) of the General Industrial Storm Water Permit every day since October 1, 1992, and will continue to be in violation every day that Alliance Recycling fails to develop and implement an effective SWPPP. Alliance Recycling is subject to penalties for violations of the Order and the Act occurring since February 2, 2002.

CSPA Notice of Violation and Intent To File Suit
February 2, 2007
Page 9 of 11

**E.      *Failure to Address Discharges Contributing to Exceedances of Water Quality Standards.***

Receiving Water Limitation C(3) requires a discharger to prepare and submit a report to the Regional Board describing changes it will make to its current BMPs in order to prevent or reduce the discharge of any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards. Once approved by the Regional Board, the additional BMPs must be incorporated into the Facility's SWPPP. The report must be submitted to the Regional Board no later than 60-days from the date the discharger first learns that its discharge is causing or contributing to an exceedance of an applicable water quality standard. Receiving Water Limitation C(4)(a). Section C(11)(d) of the Permit's Standard Provisions also requires dischargers to report any noncompliance. *See also* Provision E(6). Lastly, Section A(9) of the Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

As indicated above, Alliance Recycling discharges storm water containing unacceptable levels of TSS, pH, specific conductivity, oil and grease, COD, aluminum, copper, iron, lead and zinc that are causing or contributing to exceedances of applicable water quality standards for the receiving waters. For each of these pollutants, Alliance Recycling was required to submit a report pursuant to Receiving Water Limitation C(4)(a) within 60-days of becoming aware of levels in its storm water exceeding the EPA Benchmarks and applicable water quality standards.

Based on CSPA's review of available documents, Alliance Recycling was aware of high levels of many of these pollutants prior to February 2, 2002. Yet, Alliance Recycling has never filed a timely report describing its noncompliance with the General Industrial Storm Water Permit in violation of Section C(11)(d).

Alliance Recycling has been in continuous violation of Receiving Water Limitation C(4)(a) and Sections C(11)(d) and A(9) of the General Industrial Storm Water Permit every day since at least February 2, 2002, and will continue to be in violation every day that Alliance Recycling fails to prepare and submit the requisite reports, receives approval from the Regional Board and amends its SWPPP to include approved BMPs. Alliance Recycling is subject to penalties for violations of the General Industrial Storm Water Permit and the Act occurring since February 2, 2002.

**F.      *Failure to File Timely, True and Correct Annual Reports.***

Section B(14) of the General Industrial Storm Water Permit requires dischargers to submit an Annual Report by July 1st of each year to the executive officer of the relevant Regional Board. The Annual Report must be signed and certified by an appropriate corporate officer. General Industrial Storm Water Permit, Sections B(14),

CSPA Notice of Violation and Intent To File Suit
February 2, 2007
Page 10 of 11

C(9), (10).  Section A(9)(d) of the General Industrial Storm Water Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Industrial Storm Water Permit.  *See also* General Industrial Storm Water Permit, Sections C(9) and (10) and B(14).

CSPA's investigation indicates that Alliance Recycling has signed and submitted incomplete Annual Reports and purported to comply with the General Industrial Storm Water Permit despite significant noncompliance at the Facility.  Consequently, Alliance Recycling has violated Sections A(9)(d), B(14) and C(9) & (10) of the General Industrial Storm Water Permit every time Alliance Recycling submitted an incomplete or incorrect annual report that falsely certified compliance with the Act.  These violations are continuous and ongoing until Alliance Recycling submits a complete and correct Annual Report for each year that Alliance Recycling has been subject to the General Permit. Alliance Recycling is subject to penalties for violations of Section (C) of the General Industrial Storm Water Permit and the Act occurring since February 2, 2002.

**III.    Persons Responsible for the Violations.**

CSPA puts Alliance Recycling, Inc. on notice that it is the person responsible for the violations described above.  If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA puts Alliance Recycling on notice that it intends to include those persons in this action.

**IV.    Name and Address of Noticing Party.**

Our name, address and telephone number is as follows:

Bill Jennings, Executive Director
California Sportfishing Protection Alliance
3536 Rainier Avenue
Stockton, CA 95204
(209) 464-5067

**V.    Counsel.**

CSPA has retained legal counsel to represent it in this matter.  Please direct all communications to:

Andrew L. Packard
Law Offices of Andrew L. Packard
319 Pleasant Street
Petaluma, CA 94952
(707) 763-7227
Andrew@packardlawoffices.com

Michael R. Lozeau
Law Office of Michael R. Lozeau
1516 Oak Street, Suite 216
Alameda, California 94501
(510) 749-9102
mrlozeau@lozeaulaw.com

CSPA Notice of Violation and Intent To File Suit
February 2, 2007
Page 11 of 11

## VI.    Penalties.

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects Alliance Recycling to a penalty of up to $32,500 per day per violation for all violations occurring during the period commencing five years prior to the date of this Notice of Violations and Intent to File Suit.  In addition to civil penalties, CSPA will seek declaratory relief and injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law.  Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)), permits prevailing parties to recover costs and fees, including attorneys' fees.

CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  We intend to file a citizen suit under Section 505(a) of the Act against Alliance Recycling and its agents for the above-referenced violations upon the expiration of the 60-day notice period.  However, during the 60-day notice period, we would be willing to discuss effective remedies for the violations noted in this letter.  If you wish to pursue such discussions in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period.  We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.


Sincerely,



Bill Jennings, Executive Director
California Sportfishing Protection Alliance

## SERVICE LIST

Steve Johnson, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Wayne Nastri, Administrator
U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Alberto Gonzalez, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Celeste Cantú, Executive Director
State Water Resources Control Board
1001 I Street Sacramento, CA 95814
P.O. Box 100
Sacramento, CA 95812-0100

Bruce H. Wolfe, Executive Officer II
San Francisco Bay Regional Water Quality Control Board
1515 Clay Street, Suite 1400
Oakland, CA 94612

Paul P. Spaulding
Farella Braun Martell LLP
235 Montgomery Street, 30th Floor
San Francisco, CA 94104

## ATTACHMENT A

Significant Rain Events, Alliance Recycling, Inc. (Oakland)
February 2, 2002 – February 2, 2007

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| February | 08 | 2002 | December | 27 | 2002 | April | 29 | 2003 |
| February | 07 | 2002 | December | 28 | 2002 | May | 02 | 2003 |
| February | 13 | 2002 | December | 29 | 2002 | May | 03 | 2003 |
| February | 16 | 2002 | December | 30 | 2002 | May | 06 | 2003 |
| February | 17 | 2002 | December | 31 | 2002 | May | 07 | 2003 |
| February | 18 | 2002 | January | 09 | 2003 | May | 08 | 2003 |
| February | 19 | 2002 | January | 10 | 2003 | May | 30 | 2003 |
| February | 20 | 2002 | January | 12 | 2003 | July | 24 | 2003 |
| February | 22 | 2002 | January | 20 | 2003 | September | 03 | 2003 |
| February | 23 | 2002 | January | 21 | 2003 | November | 02 | 2003 |
| March | 05 | 2002 | January | 22 | 2003 | November | 03 | 2003 |
| March | 06 | 2002 | January | 23 | 2003 | November | 06 | 2003 |
| March | 07 | 2002 | February | 11 | 2003 | November | 07 | 2003 |
| March | 09 | 2002 | February | 12 | 2003 | November | 08 | 2003 |
| March | 10 | 2002 | February | 13 | 2003 | November | 09 | 2003 |
| March | 17 | 2002 | February | 15 | 2003 | November | 14 | 2003 |
| March | 22 | 2002 | February | 16 | 2003 | November | 15 | 2003 |
| March | 23 | 2002 | February | 19 | 2003 | November | 17 | 2003 |
| April | 09 | 2002 | February | 25 | 2003 | November | 30 | 2003 |
| April | 16 | 2002 | February | 26 | 2003 | December | 01 | 2003 |
| April | 29 | 2002 | March | 13 | 2003 | December | 02 | 2003 |
| May | 19 | 2002 | March | 14 | 2003 | December | 04 | 2003 |
| May | 20 | 2002 | March | 15 | 2003 | December | 05 | 2003 |
| May | 21 | 2002 | March | 16 | 2003 | December | 06 | 2003 |
| June | 21 | 2002 | March | 17 | 2003 | December | 07 | 2003 |
| June | 22 | 2002 | March | 18 | 2003 | December | 09 | 2003 |
| August | 02 | 2002 | March | 19 | 2003 | December | 10 | 2003 |
| November | 07 | 2002 | March | 20 | 2003 | December | 12 | 2003 |
| November | 08 | 2002 | March | 23 | 2003 | December | 13 | 2003 |
| November | 10 | 2002 | March | 26 | 2003 | December | 14 | 2003 |
| December | 06 | 2002 | April | 01 | 2003 | December | 19 | 2003 |
| December | 09 | 2002 | April | 02 | 2003 | December | 20 | 2003 |
| December | 10 | 2002 | April | 03 | 2003 | December | 21 | 2003 |
| December | 13 | 2002 | April | 04 | 2003 | December | 23 | 2003 |
| December | 14 | 2002 | April | 12 | 2003 | December | 24 | 2003 |
| December | 15 | 2002 | April | 13 | 2003 | December | 25 | 2003 |
| December | 16 | 2002 | April | 14 | 2003 | December | 28 | 2003 |
| December | 17 | 2002 | April | 16 | 2003 | December | 29 | 2003 |
| December | 18 | 2002 | April | 21 | 2003 | January | 01 | 2004 |
| December | 19 | 2002 | April | 22 | 2003 | January | 02 | 2004 |
| December | 20 | 2002 | April | 24 | 2003 | January | 06 | 2004 |
| December | 21 | 2002 | April | 25 | 2003 | January | 08 | 2004 |
| December | 25 | 2002 | April | 27 | 2003 | January | 09 | 2004 |
| December | 26 | 2002 | April | 28 | 2003 | January | 14 | 2004 |

**ATTACHMENT A**

Significant Rain Events, Alliance Recycling, Inc. (Oakland)
February 2, 2002 – February 2, 2007

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| January | 23 | 2004 | December | 06 | 2004 | February | 21 | 2005 |
| January | 24 | 2004 | December | 07 | 2004 | February | 26 | 2005 |
| January | 26 | 2004 | December | 08 | 2004 | February | 27 | 2005 |
| January | 27 | 2004 | December | 10 | 2004 | February | 28 | 2005 |
| January | 30 | 2004 | December | 26 | 2004 | March | 01 | 2005 |
| February | 01 | 2004 | December | 27 | 2004 | March | 02 | 2005 |
| February | 02 | 2004 | December | 28 | 2004 | March | 03 | 2005 |
| February | 03 | 2004 | December | 29 | 2004 | March | 04 | 2005 |
| February | 06 | 2004 | December | 30 | 2004 | March | 09 | 2005 |
| February | 13 | 2004 | December | 31 | 2004 | March | 18 | 2005 |
| February | 15 | 2004 | January | 01 | 2005 | March | 19 | 2005 |
| February | 16 | 2004 | January | 02 | 2005 | March | 20 | 2005 |
| February | 17 | 2004 | January | 03 | 2005 | March | 21 | 2005 |
| February | 18 | 2004 | January | 04 | 2005 | March | 22 | 2005 |
| February | 20 | 2004 | January | 05 | 2005 | March | 23 | 2005 |
| February | 21 | 2004 | January | 06 | 2005 | March | 27 | 2005 |
| February | 22 | 2004 | January | 07 | 2005 | March | 28 | 2005 |
| February | 24 | 2004 | January | 08 | 2005 | March | 29 | 2005 |
| February | 25 | 2004 | January | 09 | 2005 | April | 03 | 2005 |
| February | 26 | 2004 | January | 10 | 2005 | April | 04 | 2005 |
| February | 27 | 2004 | January | 11 | 2005 | April | 07 | 2005 |
| March | 01 | 2004 | January | 12 | 2005 | April | 08 | 2005 |
| March | 25 | 2004 | January | 13 | 2005 | April | 22 | 2005 |
| March | 27 | 2004 | January | 16 | 2005 | April | 23 | 2005 |
| April | 18 | 2004 | January | 17 | 2005 | April | 27 | 2005 |
| April | 19 | 2004 | January | 18 | 2005 | April | 28 | 2005 |
| April | 20 | 2004 | January | 19 | 2005 | April | 29 | 2005 |
| April | 21 | 2004 | January | 20 | 2005 | May | 04 | 2005 |
| May | 28 | 2004 | January | 21 | 2005 | May | 05 | 2005 |
| August | 23 | 2004 | January | 22 | 2005 | May | 08 | 2005 |
| August | 24 | 2004 | January | 23 | 2005 | May | 09 | 2005 |
| September | 19 | 2004 | January | 24 | 2005 | May | 18 | 2005 |
| October | 17 | 2004 | January | 25 | 2005 | May | 19 | 2005 |
| October | 19 | 2004 | January | 26 | 2005 | June | 8 | 2005 |
| October | 20 | 2004 | January | 27 | 2005 | June | 09 | 2005 |
| October | 23 | 2004 | January | 28 | 2005 | June | 16 | 2005 |
| October | 25 | 2004 | February | 07 | 2005 | June | 17 | 2005 |
| October | 26 | 2004 | February | 11 | 2005 | June | 18 | 2005 |
| November | 03 | 2004 | February | 14 | 2005 | October | 14 | 2005 |
| November | 04 | 2004 | February | 15 | 2005 | October | 15 | 2005 |
| November | 09 | 2004 | February | 16 | 2005 | October | 26 | 2005 |
| November | 10 | 2004 | February | 17 | 2005 | October | 29 | 2005 |
| November | 11 | 2004 | February | 18 | 2005 | November | 03 | 2005 |
| November | 13 | 2004 | February | 19 | 2005 | November | 04 | 2005 |
| November | 27 | 2004 | February | 20 | 2005 | November | 07 | 2005 |

**ATTACHMENT A**

Significant Rain Events, Alliance Recycling, Inc. (Oakland)
February 2, 2002 – February 2, 2007

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| November | 08 | 2005 | February | 17 | 2006 | April | 09 | 2006 |
| November | 09 | 2005 | February | 04 | 2006 | April | 05 | 2006 |
| November | 25 | 2005 | February | 02 | 2006 | April | 03 | 2006 |
| November | 28 | 2005 | February | 26 | 2006 | April | 07 | 2006 |
| November | 29 | 2005 | February | 01 | 2006 | April | 04 | 2006 |
| December | 01 | 2005 | February | 27 | 2006 | April | 12 | 2006 |
| December | 02 | 2005 | February | 28 | 2006 | April | 02 | 2006 |
| December | 07 | 2005 | March | 29 | 2006 | April | 11 | 2006 |
| December | 17 | 2005 | March | 17 | 2006 | April | 16 | 2006 |
| December | 18 | 2005 | March | 21 | 2006 | May | 24 | 2006 |
| December | 19 | 2005 | March | 11 | 2006 | May | 19 | 2006 |
| December | 20 | 2005 | March | 13 | 2006 | May | 21 | 2006 |
| December | 21 | 2005 | March | 30 | 2006 | June | 28 | 2006 |
| December | 22 | 2005 | March | 04 | 2006 | July | 20 | 2006 |
| December | 25 | 2005 | March | 10 | 2006 | July | 06 | 2006 |
| December | 26 | 2005 | March | 28 | 2006 | July | 21 | 2006 |
| December | 27 | 2005 | March | 07 | 2006 | August | 02 | 2006 |
| December | 28 | 2005 | March | 01 | 2006 | October | 05 | 2006 |
| December | 29 | 2005 | March | 02 | 2006 | November | 2 | 2006 |
| December | 30 | 2005 | March | 09 | 2006 | November | 11 | 2006 |
| December | 31 | 2005 | March | 27 | 2006 | November | 13 | 2006 |
| January | 06 | 2006 | March | 12 | 2006 | November | 26 | 2006 |
| January | 08 | 2006 | March | 03 | 2006 | December | 8 | 2006 |
| January | 13 | 2006 | March | 16 | 2006 | December | 9 | 2006 |
| January | 21 | 2006 | March | 31 | 2006 | December | 10 | 2006 |
| January | 03 | 2006 | March | 06 | 2006 | December | 12 | 2006 |
| January | 18 | 2006 | March | 24 | 2006 | December | 13 | 2006 |
| January | 11 | 2006 | March | 14 | 2006 | December | 15 | 2006 |
| January | 27 | 2006 | March | 20 | 2006 | December | 21 | 2006 |
| January | 07 | 2006 | March | 25 | 2006 | December | 26 | 2006 |
| January | 01 | 2006 | March | 05 | 2006 | January | 3 | 2007 |
| January | 17 | 2006 | April | 01 | 2006 | January | 4 | 2007 |
| January | 30 | 2006 | April | 17 | 2006 | January | 27 | 2007 |
| January | 28 | 2006 | April | 15 | 2006 | January | 28 | 2007 |
| January | 02 | 2006 | April | 08 | 2006 | | | |
| January | 14 | 2006 | April | 10 | 2006 | | | |